EJECTMENT.

# Fauntleroy's Heirs *vs* Dunn.

### ERROR TO THE GARRARD CIRCUIT.

Case 154.        *Deeds of confirmation.    Conveyances.    Release.*

*May* 24.    CHIEF JUSTICE EWING delivered the opinion of the Court.

THE terms of the deeds of 1831 are so expressed as to be susceptible of being construed as a bargain and sale, release or confirmation, and should be construed in that way which will render them *operative,* in the effectuation of the object for which they were made, and being so construed, the title is complete in the defendant below.

Judgment affirmed, with costs.

*Bradley & Robertson* for plaintiffs: *Owsley & Goodloe* for defendant.

### PETITION FOR RE-HEARING,

#### By Mr. Bradley.

BETWEEN 1780 and 1790, the grand-mother of the lessors of the plaintiffs intermarried with a man by the name of McDonald, by whom she had one son, whose name was James; that a short time after the birth of James, his father departed this life, after having surveyed and patented several thousand acres of *valuable* land in the *now* State of Kentucky, (a part of which is that now in contest;) a short time after the death of old Mr. McDonald, his widow was married to James Harrod, one of the first pioneers of Kentucky, and by whom she had one child, who was the mother of the lessors, who departed this life in the year 1841; she was married to John Fauntleroy in 1802 or 1803, who is still living, but never was in the *actual possession* of any part of the land in

contest. A short time after the birth of the mother of the lessors, James McDonald, her half-brother, departed this life, (in 1799,) an infant, without issue, leaving his half-sister, by the mother's side, his only heir at law.; in 1842, lessors, the only heirs of their mother, instituted their action of ejectment in the Garrard Circuit Court, for the land in controversy, against defendant, who on the trial in the Court below admitted that he was in possession of said land before and at the commencement of this suit.

To defeat the plaintiff's right of recovery, and to show that the legal title had deen conveyed, and passed from the mother of the lessors, the counsel for the defendant read to the jury two deeds from Fauntleroy and wife to Adams and Mouzey, dated in 1812 and 1814, and proved that they embraced the land in contest. These deeds were in due form recorded in the time required by law, in the Garrard County Court Clerk's Office, where the land lay : but the Clerk, before whom Mrs. Fauntleroy was privily examined, only certified that she relinquished her right of *dower* to the land included in said deeds. The defendant then offered to read to the jury two other instruments of writing, purporting to be deeds from Fauntleroy and wife to Adams and Dunn, the defendant, bearing date in 1831, to the reading of which, or either of them, the counsel for the plaintiff objected, but the Court overruled the objection, and not only permitted them to be read to the jury, but decided, and instructed the jury that they were good *independent* deeds of bargain and sale, and as such fully sufficient to pass the *fee simple* title to said land. To this opinion of the Court (there having been a verdict and judgment for the defendant,) the plaintiffs excepted, and by writ of error brought the case to this Court for revision, where the judgment of the inferior Court has been *affirmed.*

It is said by this Court, that "the terms of the deeds of 1831 are so expressed as to be susceptible of being construed as a bargain and sale, release or confirmation."

According to this view of the case, the instruments of writing dated in 1831, have three different qualities, and may be construed in three distinct and differnt ways :

1. As deeds of bargain and sale; 2. As deeds of release; 3. As deeds of confirmation.

With great respect and deference to the opinion of this Court, I contend that the instruments of writing, dated in 1831, are neither deeds of bargain and sale or of release, and that this question may directly be put in issue, I will here copy each one of the deeds or instruments dated in 1831.

### Deed from Fauntleroy and wife to Adams.

''This indenture of bargain and sale, made and entered into this 8th day of May, 1831, by John Fauntleroy and Margaret his wife, of the county of Mercer and State of Kentucky, of the one part, and William Adams, of the county of Rockcastle and State aforesaid, of the other part: Witnesseth, That for and in consideration of $2250, said Fauntleroy and wife, heretofore, to wit: on the 31st day of March, 1812, signed, sealed and delivered to the said William Adams, a certain deed of bargain and sale, for a special boundary of land, described in said deed, situate, lying and being in the county of Garrard and State aforesaid, which said deed was afterwards on the same day acknowledged by the said Fauntleroy and wife before the Clerk of the Mercer County Court, and the said deed, together with the certificate of said Clerk, was afterwards lodged with the Clerk of the Garrard County Court, and by him recorded.

''Now, these presents witnesseth, That for inasmuch as doubts have arisen as to the due execution of the said deed, so as to pass the estate and inheritance of the said Margaret Fauntleroy, and for the purpose of removing these doubts, and confirming the title to the said Adams, the said John Fauntleroy and Margaret his wife, in consideration of the premises, and in the further consideration of one dollar to them in hand paid, have bargained, sold, released and confirmed, unto the said William Adams, the said tract of land, so as aforesaid described in the deed which was acknowledged, as aforesaid, and recorded in the Clerk's Office of the Garrard County Court, as aforesaid, with its appurtenances, unto the said William Adams, and his heirs forever; and the said Fauntleroy and wife, for themselves, their heirs, &c. do,

and will, forever warrant and defend the said described tract of land, to the said William Adams, his heirs and assigns, against the claims of all persons whatsoever.

"But it is understood that this warranty is only to be binding, upon the condition that the deeds before acknowledged by said Fauntleroy and wife be adjudged insufficient to pass the estate of inheritance from the said wife of John Fauntleroy.

"In witness whereof, &c."

*Deed from Fauntleroy and wife to Dunn.*

"This indenture, made and entered into this 13th day of July, 1831, between John Fauntleroy and Margaret his wife, of the county of Mercer, of the one part, and Uriah Dunn, of the county of Garrard, of the other part: Witnesseth, That whereas the said John Fauntleroy and Margaret his wife, by deed bearing date the 26th day of March, 1814, now of record in the Clerk's office of the Garrard County Court, sold and conveyed to a certain Henry Mouzey, a tract of land lying in said county of Garrard, on the north side of Gilbert's creek, containing 137¾ acres of land, according to the metes and boundaries more particularly set out in said deed : and whereas, the said Henry Mouzey has departed this life, having first published his last will and testament, directing said tract of land to be sold by his executors, in pursuance of which the same was sold, and purchased by Uriah Dunn, who is now the owner and in possession of it, and inasmuch as the deed aforesaid, from Fauntleroy and wife to Mouzey, bearing date the 26th March, 1814, is believed to be defective and not sufficient to pass the fee simple title to said land, in consequence of the said Margaret Fauntleroy not having relinquished her right of inheritance to said land.

"Now, for the purpose of conveying the fee simple title to said land, and for the further consideration of one dollar in hand paid, to the said John Fauntleroy and wife, the receipt of which is hereby acknowledged, they do hereby convey, grant and confirm, unto the said Uriah Dunn, the aforesaid 137¾ acres of land, *according to the metes and boundaries set out in the aforesaid deed from*

*Fauntleroy and wife to Mouzey :* to have and to hold, &c.''

1st. Are these independent deeds of bargain and sale?

To ascertain this fact I will extract from each one of the aforegoing deeds their separate and independent parts, for this, to my mind, is the only legitimate way of testing the question under consideration.

*Deed from Fauntleroy and wife to Adams—independent parts of.*

''This indenture of bargain and sale, made and entered into this 8th day of May, 1831, by John Fauntleroy and Margaret his wife, of the county of Mercer and State of Kentucky, of the one part, and William Adams, of the county of Rockcastle and State aforesaid, of the other part: Witnesseth, That for and in consideration of $2250 to them paid, the said Fauntleroy and wife, in the further consideration of one dollar to them in hand paid, have bargained, sold, aliened and confirmed, unto the said William Adams, the said tract of land, with its appurtenances, to have and to hold unto him, the said William Adams, and his heirs forever; and the said Fauntleroy and wife, for themselves and their heirs, &c. do and will forever warrant the said described tract of land, to the said William Adams and his heirs, against the claim of all persons whatsoever. But it is understood that this warranty is only to be binding upon the condition that the deed heretofore acknowledged by the said Fauntleroy and wife, should be adjudged insufficient to pass the estate of inheritance from the said wife of John Fauntleroy.

''In testimony whereof, &c.''

*Deed from Fauntleroy and wife to Dunn—independent parts of.*

''This indenture, made and entered into this 13th day of July, 1831, between John Fauntleroy and Margaret his wife, of the county of Mercer, of the one part, and Uriah Dunn, of the county of Garrard, of the other part: Witnesseth, And the further consideration of one dollar in hand paid to the said John Fauntleroy and Margaret his wife, the receipt whereof is hereby acknowledged, the said John Fauntleroy and wife do hereby convey, grant and confirm unto the said Uriah Dunn, to have and to

hold the said tract of land, with all and singular the appurtenances thereunto belonging, to him the said Dunn and his heirs, in *fee simple* forever; and the said Fauntleroy and wife do further covenant to warrant and defend the title to the said land, to him the said Dunn, against all claims whatsoever.

"In testimony whereof, &c."

The sole question is, whether these deeds, in their independent and separate parts, when extracted from the deeds of 1812 and 1814, are sufficient of themselves, and according to their own provisions, to pass the fee simple title to the land in contest, or in other words, whether they are good deeds of bargain and sale, as has been decided by this Court?

To understand the true construction of these deeds as here presented, it will only be necessary to measure them by the long established, well known, and unerring rules which have been laid down by the ancient sages of the law.

What then are the requisites of such an instrument?

1st. Sufficient parties and proper subject matter.

2d. A good and sufficient consideration.

3d. Writing on paper or parchment duly stamped.

4th. Legal and orderly parts, which are—1. The premises; 2. The *habendum;* 3. The *tenendum;* 4. The *reddendum;* 5. The conditions; 6. The warranty; 7. The covenant; 8. The conclusion.

5th. Reading it, if desired.

6th. Sealing and signing it.

7th. Delivery.

8th. Attestation: *Chitty's Blackstone, 1st. vol. 2d. book, 20th. chap. pages* 238–9–40–41–42 and 43.

I am aware that according to modern authority, some of the ancient requisites of deeds have been dispensed with by this and some other Courts of the United States, but there are still a few well known and *indispensable* requisites to all valid and binding deeds, one of which is the description of the thing granted or sold, and this cannot be *too minute* and *accurate.* It is said in *Lomex's Digest, vol. 2d. page* 210, that "every thing intended to be conveyed, should be particularly mentioned and set down

in its proper order; such as manors, messuages, farms, lands, tenements, and hereditaments; *all* which should be described by their situation, county, hundred, tithing or ville, hamlet and parish, number of acres, and boundaries, and in whose tenure and occupation."

How then will the deeds under consideration measure or hold out with these great and unerring rules? The answer must be, that neither of the requisites, respecting the boundaries or location of this land, has been complied with in any one particular.

In what part of the county of Garrard, according to the independent parts of these deeds, does the land in question lay?

On what water course or other notorious place can it be found?

How many acres are there; how bounded; out of what patent, entry or survey was the same located, taken or sold?

What the amount per acre; when to be paid, &c.?

In all this important part, we are left totally in the dark.

Suppose the defendant, Dunn, had been ousted and dispossessed of this land by a third person, could he have maintained his action of ejectment successfully, and turned, by legal process of law, the wrong doer out of *possession*, upon the strength alone of the legal title conferred on him by his deeds of 1831, according to its independent and separate parts, when taken from the deed of 1814, of Fauntleroy and wife to Mouzey?

According to the deeds of 1831, and from any description given in them, when taken in their independent character, how could the Sheriff or Surveyor find the land in contest?

At what part would the Surveyor set his jacob-staff to run this land; what course; upon what lines, either natural or artificial, and to what corners or objects could he start to make and close this survey; how much land could he report as being included in the same?

All this would be vague and uncertain in the extreme, and in fact, impossible to be performed by any human being, and consequently the plaintiff never could recover under such circumstances, and with such a title, because

his deed would not be sufficient to show for how much or what part of the soil within the whole county of Garrard or Commonwealth of Kentucky he had the legal title, whether to one acre or to one hundred thousand acres, or its quality, location or value.

If the defendant could not have succeeded in an action of ejectment for the land in contest, upon the deed now under consideration, could he have successfully defended an action of ejectment, when a clear legal title from the Commonwealth to the lessors had been made out, merely by showing the title within himself, upon the strength of the deed aforesaid, and in no other way than his bare claim under that deed?

Surely this could not have been done according to any known rule or principle in law, governing this form of action, nor would this be contended for by any one who is at all acquainted with such proceedings.

If the doctrine which I have here been contending for be correct, how is it possible that the deeds of 1831 are good, as deeds of bargain and sale?

Surely this cannot be seriously contended for by the Court.

But it may be contended that the deeds of 1831, when connected with the former deeds of 1812 and '14, show the precise quantity, boundary, &c. of the land in contest, this however, would be foreign from the legitimate question in issue for two reasons :

1st. Because the Court, in affirming the judgment below, have decided that the deeds of 1831 were *separate* and *independent* deeds of bargain and sale.

2d. Because the first deeds of 1812 and '14, so far as respects the title of Mrs. Fauntleroy and her heirs, (the lessors,) are *void* absolutely, and as such wholly ineffectual for any and all purposes ; which, however, will be more fully dwelt upon and explained in another part of this petition : but conceding for the present, that the first deeds are void, can they or any part of them be brought in to aid and uphold the deeds of 1831? Unquestionably this cannot be done without a direct violation of every legal rule of construction and judicial decision known to the law.

What is understood by a *void* deed? *One which is vague, empty, not filled up with visible matter; having no legal or binding force ; null, not effectual to bind parties, or to convey or support a right; not sufficient to produce its effect; unsubstantial and vain.*

If these definitions or any one of them be correct, of what force or efficacy are the deeds of 1812 and '14? Can they be used for any purpose? Surely not.

How then do they stand, and how must they be viewed and treated in legal contemplation? The answer must be, according to every legal rule, that they are worth no more than a blank piece of paper, or a thing which never was in existence ; that never were visible, sufficient to produce no effect ; vain, idle, and not even imaginary, legally speaking.

How then can they shed any light upon or in any single instance uphold, sustain or support the deeds of 1831?

But it may be said that the boundaries, courses and distances, and quantity of land specified in the deeds of 1812 and '14, are mere matter of description, and in that view may be brought in to aid the deeds of 1831.

But suppose these deeds had not specified the courses, distances, boundaries, or quantities of the land in contest, what aid would they then have been? Or suppose there never had been such people in existence as John Fauntleroy and wife, William Adams, Henry Mouzey and Uriah Dunn, could the deeds of such individuals, on the surmise or supposition that some such individuals had or would live, be called in to aid and add strength to the deeds of 1831? Or suppose, in fact, that there were no such deeds as those of 1812 and '14, could the mere surmise or supposition, that perchance, at some unknown, vague, and indefinite period there had been such, be called in to breathe life and vigor, and to give legal power and animation to the deeds of 1831, and thereby make them good, valid, and binding?

In the case of *Sheafer* vs *Gates and wife*, we find the following language used by the Court : "*Did the lapse of twenty-three years prior to this suit, infuse vitality and vigor into that which was thus born dead? Has a judgment once void, been made valid by time?* Justice and the repose

of society having induced the adoption of many legal presumptions, and among these is, that which, after a very long lapse of time, cures irregularities, in judicial proceedings, and assumes that every thing that was done was solemnly and rightly done, and that also which even presumes, in some rare cases, that an unfound record once existed:" (2 *B. Monroe*, 457.)

With the same propriety and under the same rule, here established, I might ask if the deeds of 1812 and '14, could infuse vitality and vigor, (they being in the very inception dead,) into the deeds of 1831. Has a deed once void ever been made valid by a mere confirmation or ratification of the same by any subsequent instrument or deed?

Surely nothing of this kind ever has or can be done.

Under this view of this case, I do not look upon the boundaries, courses, distances, and quantity of land mentioned in the first deed, of as much efficacy as if the same had been found on a separate piece of paper or field notes of a Surveyor, because in the latter case the mere memorandum of the boundary, courses, distances, and quantity of land, made out by a Surveyor or other person, might, under other circumstances, be referred to for some legal purposes, to refresh the minds of witnesses and the like; and therefore, would be of some value, and form a sort of foundation upon which to give or base an opinion, and might, under certain circumstances, even be the foundation of a claim which would be valid in law.

But not so with the deeds of 1812 and '14, for to all legal purposes they stand as blanks and mere nullities, in legal contemplation, and therefore, to all intents and purposes, not sufficient for any thing.

But it may be contended that the last mentioned deeds are good, so far as respects the boundaries, &c. but void as to the residue. According to this rule, however, they might be void as regarded the boundaries, courses and distances, and the quantity of land embraced in them, and valid as to the residue; and under the same principle of construction, they may be entirely valid throughout, because if one party has a right to select any portion or parts of them as valid, he may, with the same propriety,

contend that they are all valid; or, on the other hand, if one party has the right to contend and establish any one part of either of these deeds void, he has the right to contend that the whole tenor and effect of them is invalid and void; and hence the proper rule to adopt is, that said deeds either are or are not void, or are or are not good and valid. To say that they are valid in one part and invalid or void in another, and to allow the defendant to select out that portion or part which may be found to his advantage, and establish that as good and binding, and to say that the residue and the remainder is no better than blank paper, would not only be doing great violence to all legal construction but injustice to the parties concerned; and yet absurd as all this is, it is no more or less than what must be done, if the boundary, courses, distances, location and quantity of the land mentioned in the first deeds, as therein specified, are to be called in to add to, explain, aid and assist, and make sense and meaning, give life, strength, vigor, animation, power and efficacy to the deeds of 1831.

This would surely be an *anomaly* in the whole history of jurisprudence, and perfectly heterodox in its character, standing alone upon its own solitary basis, and unlike, and entirely disconnected with all law, both ancient and modern, human or divine, and surely never can receive the sanction of this Court.

Under these circumstances, is it proper to connect or disconnect the deeds of 1831, with those of 1812 and '14?

If language, law, common sense, expediency or propriety be consulted, this can never be done under any circumstances, or in any one instance or part.

Can those two void instruments be brought in *to support, nourish and feed the deeds of 1831?* I am fully and thoroughly convinced that this never can be done, without an open violation to the laws of nature, as well as the laws of man; and I am equally as well convinced, and as thoroughly satisfied, that the instruments of 1831, without doing violence to all the rules aforesaid, can never be construed, according to their letter, spirit or terms, into deeds of bargain and sale. To do this, is no more than deciding that two deeds, or classes of deeds, dated in

1812, 1814 and 1831, when disunited and disconnected from each other, are totally, and to all intents and purposes void, but when connected, united and cemented together, they will make one valid and binding instrument; that is, notwithstanding the first and second classes of deeds, when taken alone and disconnected, amount to no more than two blank sheets of paper, but when thrown together, as with a magic power, strange and novel within itself, the two dead instruments, as with a touch of Omnipotence, at once, in the twinkling of an eye, spring up into life and being, and in their animated forms take their stations among the legal proceedings of the country.

1st. Can the deeds of 1831 reach back and make good and binding those of 1812 and '14? Surely not, if law is to have any influence in this case.

Under this rule of construction, is it not worse than absurd to say that the deeds of 1812 and '14, were intended to reach forward, look through futurity, and make good, valid and binding the deeds of 1831?

When I look upon this Court as the great luminary of day, confined to the centre of the vast judicial firmament, from which it scatters impartially and indiscriminately its bright and cheering rays upon all the inferior tribunals which revolve around it, and through them casting the same brilliant and cheering rays to the hundreds of thousands of individuals of this Commonwealth, of all grades, denominations, classes and conditions, who can but stand confined to their more limited and more inferior stations, and gaze with wonder and delight upon the great luminous body which gives laws, rules, regulations, and in fact legal existance to them all, suited to the various stations, classes and conditions—I say, when I view this Court as occupying this lofty and enviable station, I cannot for a moment believe that they will adhere to and establish, as the fixed and settled laws of this land, unchanged and unaltered, the opinion which they have, in the great and uncommon press of business, established in this case.

This question being disposed of, the next in order is, whether the deeds of 1831 are good deeds of release?

The same objection applies to this construction of the deeds as did to that construing them into bargains and sales: but to directly test this question in a few words, we will apply the instruments of 1831, in their disunited and disconnected form, stript and made bare. From the aid and influence of the first deeds, of 1812 and '14, suppose the release had run thus: We, John Fauntleroy and Margaret his wife, have this day released, quit-claimed, and transferred all our right, title, claim and interest, in and to the land hereby conveyed and released to Uriah Dunn, for the further consideration of one dollar to us in hand paid; and the said Fauntleroy and wife, in consideration of the premises aforesaid, do warrant to him, the said Dunn, the title to the said land, against the claim of all persons whatsoever. Witness our hands and seals, &c.

Is it not at once obvious, that Dunn could not, according to the terms of such instrument of writing, be clothed or vested with any sort of title whatever, from the mere fact that himself or no one else could tell to what land, its location, quality or boundary, or number of acres, this instrument of writing was intended to apply?

To make a release good, three things are necessary:

1st. A good releasor.

2d. A good releasee.

3d. A thing or subject matter released, and this subject matter, or thing released, must be described as would be necessary in any other grant or deed: (*Shep. Tuch.* 154.) But more will be said upon this subject in the latter part of this petition.

The third and last question is, whether the deeds of 1831, are *solely and exclusively* deeds of confirmation; and I contend they are such, and *nothing* more, and without doing violence to the rules of law governing such cases, the language and terms of the deeds themselves, and the express intention of all the parties concerned, this is the only construction, which in legal contemplation, can be given to them.

That I may not err, I will again refer to the great requisites, unerring rules, and vivid distinctions, which have been employed, laid down, adopted and *universally*

adhered to by the learned jurists and commentators of the law.

"A second grant of the same thing, to the same person, and reciting the former grant for the same thing, cannot be pleaded as a grant but as a confirmation :" (*Plow. Com.* 397.)

What then are the requisites of a confirmation, as here defined and established ?

1st. There must be a *second* grant.

2d. From the *same* party.

3d. To the *same* party.

4th. For the *same* thing.

Referring to the *former* grant.

Let us lay down and apply these rules to the deeds of Fauntleroy and wife, dated in 1831, and if they are found. exactly to correspond and hold out with the same rules and measures, to have the same characteristic distinctions, to speak the same language and run in the same channel, they must surely be of the same class, species and family.

But we will apply the rule. Deeds from Fauntleroy and wife, dated in 1831, correspond precisely to the rules here laid down, in this:

1st. They are from the *same* parties.

2nd. To the *same* parties and privies.

3rd. For the *same* land.

4th. There was a second grant for the same land.

5th. The deeds of 1831, referred in the following particulars to the former deeds of 1812 and '14—1. To the dates; 2. To the boundary; 3. To the location; 4. The consideration; 5. The time of said deeds being placed upon record; 6. The office in which they were recorded; 7. The date of the Clerk's certificates to the same; 8. To the Clerk before whom they had been acknowledged; 9. The supposed insufficiency in the first deeds to pass the fee simple title to said land; 10. The object of supplying, healing and curing the deficiency in the first deeds; 11. To make them valid and sufficient to pass the absolute title.

How is it possible, with all these striking and exact resemblances and correspondences of the deeds of 1831,

to the rule here established, that these latter deeds ever could have been construed in any other way or for any other object or purpose than deeds of confirmation alone? If we look back to the very reason and creation of estates by deeds of confirmation, we may understand much, both upon the subject and reason of the laws, rules and usages which created them; for we find that the most ancient confirmations, made after the conquest, had the same rules, regulations and features to govern them; and if we examine into modern authorities, and even the decisions of this Court, we will see that the same precise distinction, requisites and landmarks, have uniformly withstood the crush of empires and changes of government, and been adhered to at all times, and in all judicial tribunals, from the conquest to the decision by this Court of *Breckinridge's heirs* vs *Ormsby* and *Phillips and wife* vs *Green*.

And what are the rules and regulations so long adhered to and so invariably adopted by all the Courts?

The answer must be the same as before stated, to-wit: that there must be a former grant by the same party to the same party, for the same thing and referring to a previous grant for the same subject matter.

"A confirmation is the approbation or assent to an estate already created, which, as far as the confirmer's power, makes it good and valid; so that the confirmation doth not regularly create an estate:" (*Gilb. on Ten.* 75.)

Nor can this rule be changed by any form of technical words.

"The words *dedi et concessi* are as strong as the word *confirmavi*, for they amount to a grant of the right of the person in possession." (*Gilb. on Ten.* 79.)

Angel says, "that most ancient confirmations, made after the conquest, often run, like feoffments, with the words *dedi* or *concessi*, and *confirmavi*, and distinguishable from feoffments chiefly by some words *importing a former feoffment or grant*, as where they run, *dedi or concessi et confirmavi*, such lands *sicut charta facta*, to such a one (either the confirmatory or his ancestor,) *tutator*, or the like.

"In ancient time, when feoffees were frequently dis-seized of their lands, upon some suggestion or other, charters of confirmation seemed to have been in great request.

"For, in the early times after the conquest, we meet with so many confirmations successively made to the *same persons* or *their heirs or successors, of the same lands and possessions*, that it looks as if men did not ,then think themselves secure in their possessions against the King or other great lords, who were their feoffors, or in whose fees the lands lay, unless they had repeated confirmations from the King or his heirs or successors, or the other great lords or their heirs.

"And these confirmations, very anciently, seemed to have been some times made, either by precept or writ from the King or other lords, to put the feoffees or their heirs or successors into seizin, after they have been disseized, or to keep them in their seizin undisturbed, or else by charter of express confirmation." .

Here we see the very origin of this ancient mode of conveyance, and are at the same time informed by the learned author of the reason of the law.

I would here ask, what are the great requisites established and the correct deductions to be drawn from the law as above quoted? The answer must resolve itself into the same original and well known rule, to-wit:

1st. That these confirmations were made by the same Kings or Lords, or their heirs or successors.

2nd. To the same tenants or their heirs or successors.

3rd. For the same land.

4th. That there was a previous grant to same land.

5th. That the subsequent grant referred to and described the first or previous grant.

In the case of *Breckinridge's heirs* vs *Ormsby*, (1 *J. J. Marshall*, 255,) it was said by this Court, that "*any act which shows assent, especially a recognition in a subse-quent deed, which (as that of* 1802 *does,) refers to, and describes the voidable one, in a manner to evince an ac-quiesence in it, is a valid and irrevocable confirmation.*"

Also, see *Bac. Ab. title Infancy;* 15 *Mass. Rep.* 220;

*Gilb. on Ten.* 75; 11 *Johnson's Rep.* 542; *Reeves' Dom. Rel.* 240; *Phillips* vs *Green, MSS of Court of Appeals.*

Agreeably to these decisions, what construction should be given to the deeds of 1831?

Are they not acts which show assent, recognition and acquiesence in, and in fact describe the deeds of 1812 and '14?

This is a self-evident proposition, and yet, in the case of *Fauntleroy's heirs* vs *Dunn*, this same Court has decided that precisely similar instruments may be so construed as to amount to *independent and separate* deeds of bargain and sale and release.

I will here insert the precise language of the mortgage, (taken from a true copy of the same from this office,) that has been construed by this Court, in the case last referred to, to be a mortgage of confirmation; this will show more clearly than any other way, the precise analogy between the mortgage of 1802 and the deeds of 1831, under consideration:

"And whereas, the said Walter Beall, by a certain deed of indenture, executed to the said Breckinridge, bearing date the 21st day of April, 1801, and now of record in the office of the District Court, held at Bardstown, reference thereunto being had, will at large appear, did grant, make over and convey, by way of mortgage to the said Breckinridge, sundry tracts of land, slaves, houses and lots, in order to secure the payment of a certain debt therein mentioned; which said property may ultimately prove more than sufficient to a discharge of the debt in the said deed of mortgage, and in case it should be, said Beall is desirous to subject the same to the purposes of his present mortgage. He, the said Walter Beall doth, for the consideration aforesaid, and for the consideration of five shillings to him in hand paid, by said Breckinridge, grant, bargain and sell, unto the said Breckinridge, all the lands, houses, lots and slaves in the said deed of mortgage mentioned and contained, with all the appurtenances, &c."

While upon this branch of the case, I will also refer the Court to the deed of confirmation in the case of *Phillips and wife* vs *Green,* (5 *Monroe,* 355–6.)

"Now this indenture witnesseth, That for the purpose of carrying into effect the intent and meaning of said indenture and agreement, (alluding to that of 1792,) and for the consideration therein contained, we have given, granted, bargained and sold, alien, released and confirmed, and by these presents do give, grant, bargain and sell, alien, release and confirm, &c."

*Deed from Fauntleroy and wife to Adams, 1831.*

"That for and in consideration of $2250, said Fauntlery and wife, heretofore, to-wit: on the 31st day of March, 1812, signed, sealed and delivered to said Adams a certain deed of bargain and sale, for a special boundary of land, situate, lying and being in the county of Garrard and State aforesaid; which said deed was afterwards, on the same day, acknowledged by the said Fauntleroy and wife, before the Clerk of the Mercer County Court; and the said deed, together with the certificate of said Clerk, was afterwards lodged with the Clerk of the Garrard County Court, and by him recorded.  *   *  "Said Fauntleroy and wife, in consideration of the premises and the further consideration of one dollar to them in hand paid, have bargained, sold, released and confirmed, &c."

*From same to Dunn, 1831.*

"That whereas the said John Fauntleroy and Margaret his wife, by deed bearing date 26th day of March, 1814, now of record in the Clerk's office of the Garrard County Court, sold and conveyed to a certain Henry Mouzey, &c.  *   *  for the further consideration of one dollar in hand paid, to said Fauntleroy and wife, they do hereby convey, grant and confirm, unto the said Uriah Dunn, &c."

Now what is the difference between the phraseology, language or meaning of these four instruments, so far as regards the bare question of confirmation?

Are the terms of the mortgage to Breckinridge, or the terms of the deed of Philips and wife to Hickey, more capable of that construction than the terms of the deeds to Adams and Dunn?

I contend they are not, but on the contrary, that the phraseology, terms and meaning of the deeds to Adams and Dunn, are much easier construed into deeds of con-

firmation than either the mortgage or deed of Philips and wife.

But independent of words and bare technicalities, what are the distinguishing features of a deed of confirmation, I again ask, according to the opinions now under consideration?

The answer still remains exactly the same, to-wit:

1st. A former deed.

2nd. By the same party.

3rd. To the same party.

4th. For the same thing.

5th. Referring, by the terms of the subsequent to the last deed, in such a way as to show a recognition and acquiesence to the first deed.

And in the case of *Phillips and wife* vs *Green,* the Court uses this language: "it is proper to remark, that the estate of Milly McDermed, now Milly Phillips, the demandant, passed in 1792 by that deed, and not by the subsequent ratification and assent to that deed."

. According to this opinion, suppose the deed of 1792 had been *void* and not *voidable* merely, in that case no title would have passed by that deed; and if the opinion in this case be correct, no title could have passed by the deed of confirmation dated in 1796, and consequently, if neither the deed of 1792 nor that of 1796 did not pass the title of the demandant, the same still vested in her, and she must have been entitled to the lot in question, to the exclusion of all the world, and should, under such circumstances, have recovered.

Now, apply this rule to the case of *Fauntleroy's heirs* vs *Dunn.* If the deeds of 1812 and '14, were void, so far as respected the mother of the lessors, and the deeds of 1831, being mere deeds of confirmation, were also insufficient to pass her title, can it for a moment be contended that the title ever did pass from Mrs. Fauntleroy, and under such a state of case, is not the legal title of the land in contest still in the lessors?

"A release, confirmation or surrender cannot amount to a grant, nor a surrender to a confirmation, or to a release, because these be the proper and peculiar manner of

conveyances, and are destined to a special end:" (2 *Thomas' Coke*, 418.)

"Also, if I be seized of a villian, as of villian in gross, and another taketh him out of my possession, claim him to be his villian, where he hath no right to have him as his villian, and after I confirm to him the estate which he hath in my villian, this confirmation seemeth to be void, for that none may have possession of a man as of a villian in gross, but he which hath a right to have him as his villian in gross.

"And so, inasmuch as he, to whom the confirmation was made, was not seized of him as of his villian, at the time of the confirmation made, such confirmation is void:" (2 *Thomas' Coke*, *top page*, 440.)

It seems to me, therefore, that the whole of this case turns upon two questions:

1st. Are the deeds of 1812 and '14, from Fauntleroy and wife, void?

2d. If void, are the deeds of 1831 sufficient, as confirmations, to pass the title to the land in contest?

To show that the deeds of 1812 and '14 are void, I refer the Court to the following authorities: *Barnett* vs *Shackleford*, (6 *J. J. Marshall*, 532;) *Miller* vs *Shackleford*, (3 *Dana*, 291;) (*Thomas' Coke*, 124;) *N. G. Miller* vs *Shackleford*, (4 *Dana*, 277–8–9;) *Shackleford* vs *Smith*, (5 *Dana*, 232;) *Smith* vs *Shackleford*, (3 *Dana*, 474–75–76–77–78;) *Elliott* vs *The lessee of Pursol*, (1 *Peters' Reports*, 328;) *Applegate* vs *Gracy*, (9 *Dana*, 215;) *Pruit* vs *Graves*, (5 *J. J. Marshall*, 118–21;) *Blair* vs *Whitico*, (3 *J. J. Marshall*, 241.)

To show that those deeds cannot be confirmed, I refer the Court to the cases of *Breckinridge's heirs* vs *Ormsby*, (1 *J. J. Marshall*, 440;) (*Shepherd's Touchstone*, *title Confirmation*, 135; 1 *Bouvier's Law Dictionary*, *title Confirmation*, 206; 2 *Lomax's Digest*, 101; 2 *Thomas' Coke*, *title Confirmation*, *top page*, 416–443; 4 *Cruise's Digest*, 91; 3 *Bacon's Abridgement*, *title Infancy and non age*, 612;) *Stover* vs *Boswell*, (3 *Dana*, 233–4;) *Bedford's adm'rs.* vs *Clay*, (3 *Dana*, 226;) *Breckinridge's heirs* vs *Floyd*, (7 *Dana*, 459.)

These authorities are deemed entirely conclusive to show—

1st. That the deeds of 1812 and '14 are void.

2d. That the deeds of 1831 are not sufficient to pass the title to the land in contest; they being a bare confirmation of a void estate, are themselves void, according to the authority here cited, upon the last question. ' Now, if the foregoing authorities are correct, I am well satisfied that the title to the land in contest is at this moment in the lessors of the plaintiffs.

It will be recollected, that according to all the books which treat upon the subject of confirmations, that it is invariably laid down, that all *voidable* and defeasible estates are capable of confirmation; hence, in the cases of *Breckinridge's heirs* vs *Ormsby*, and *Phillips* vs *Green*, the mortgage in the first case, dated in 1801, being that of a lunatic, was merely voidable, was confirmed by the subsequent mortgage, between the same parties, dated in 1802, when the mortgagor was in a *lucid* interval; and in the second case, the deed of Milly Phillips, the demandant, dated 1792, when she was an infant, was voidable only, and as such was confirmed by the deed of 1796, which she executed when of full age, and a *feme sole:* but it will be further recollected, that the authorities are equally as clear, that the deeds of all married women, (when not executed in such a way as to pass their title to the land attempted to be conveyed, according to the common law of England and the statutory requirements of this country,) are absolutely and to all intents and purposes, void, and cannot be confirmed, except probably by some act, after the removal of the disability of *coverture.* There is one other question to which I will call the attention of this Court in this case—that is, that Fauntleroy and wife, by the deeds of 1812 and '14, passed all the right, title and interest which they had, to the land in contest, during their joint lives, although the deeds were void, as respected the fee simple interest of Mrs. Fauntleroy, because, upon the marriage of the parties, the husband immediately became entitled, by operation of law, to an interest of all the wife's lands during the existence of the coverture between them, and under

a certain state of case he might have become a tenant by the courtesy to all the wife's lands after her death: but in this case he only had an interest in the land during the joint lives of himself and wife, for never having reduced the land to actual possession or seizin, during the coverture, he could not have been tenant by courtesy: *Adams* vs *Logan*, (6 *Monroe*, 175.)

The statute of 32 *Hen. VIII*, re-enacted in this State in 1798, (*Stat. Law*, 582,) expressly provides that "no feoffment or other conveyance, &c. made, suffered or done by the husband only, of any lands, &c. of the inheritance or freehold of the wife, during the coverture, shall be or make any discontinuance thereof: but the wife and her heirs shall and may then lawfully enter into all such lands, according to their rights and titles therein, notwithstanding such feoffment or other conveyance." It is also provided by another statute of 1798, (*Stat. Law*, 110,) that all alienations purporting to pass a greater estate than the alienor hath, shall operate to pass so much of the estate as he may lawfully convey, but shall not bar the residue of the right or estate," &c: (3 *Dana*, 291–2.)

Under the operation of these statutes, the deeds of 1812 and '14, passed so much estate as Fauntleroy had in the land and no more, and these deeds further passed, according to well settled elementary authority on the subject, all the estate which Fauntleroy acquired by the marriage to the lands in contest, during the joint lives of himself and wife.

Under this view of the case, Fauntlery and wife could not have sold, transferred and conveyed, according to the terms of the deeds of 1831, any interest whatever, to any part of the land in controversy, for it will be recollected, that both the deeds of 1831 purport to pass a vested and present interest to the land; they are both in the present tense, and do not even pretend to define, convey or transfer any future interest which might, upon certain contingencies, revert and vest in Mrs. Fauntleroy. If I am correct upon this branch of the case, the deeds of 1831 are void, on the ground that there was nothing conveyed by them, it being necessary, in every good grant, that there should be a grantor, a grantee and a thing granted;

so in a confirmation, there must be a confirmor, a con-
firmee and a thing or title confirmed.

Suppose A, the son of B, sell, and by deed, with all
the various formalities and requisites, all his interest (he
being the sole heir,) to one thousand acres of land, owned
and possessed by his father, and during the life of his
father, and the next day after the sale and conveyance,
B, the father, departs this life *intestate*, in consequence
of which the *fee simple* title to the one thousand acres of
land descends upon and vests absolutely in A, would it
be contended, that under such a state of case, any thing
passed by the deed to the vendee of A? Certainly not,
and for the simple reason that A, at the time of the at-
tempted conveyance, had no title, but a bare hope or ex-
pectancy of title in the land of his father.

I am aware that this is not a case, in every particular,
directly in point, but think it perfectly analagous to the
case under consideration, so far as respects the terms and
language of the deeds of 1831, which only purport to
convey in the present tense, a title to the land in contest,
without even intimating when this title should take effect;
add to this the fact that the deed to Adams, upon its very
face, provides that it is not to take effect or become a
valid warranty until the deed of 1812 should be adjudged
insufficient to pass the fee simple title of Margaret Faunt-
leroy to the land therein designated.

It does seem to me, after taking all this into considera-
tion, that the deeds of 1831 are not sufficient to pass any
title whatever to the land in contest.

But it may be asked how the deficiencies of the deeds
of 1812 and '14 could have been remedied, or in other
words, by what mode could Fauntleroy and wife, (had
they been desirous to do so,) have conveyed and effectu-
ally passed the fee simple title to this land?

In answer to this question I would merely respond,
that the only effectual way to do this was to have re-de-
livered or re-acknowledged the old deeds of 1812 and '14,
and by doing this they would have taken effect as new
grants, from such re-delivery or acknowledgment: (2
*Lomax's Digest,* 364;) *Eppes* vs *Randolph,* (2 *Call,*
103;) *Brisco* vs *Clarke,* (1 *Rand.* 213;) *Roane* vs *Archer,*

{4 *Leigh*, 550;) *Harry* vs *Alexander*, (1 *Rand.* 219;) *Gibson* vs *Randolph*, (2 *Mun.* 310.)

"And so, also, it would seem that if such deeds be subsequently re-acknowledged by the parties and upon such re-acknowledgment, or proof or certificate thereof, according to law, be delivered to the Clerk within eight months after the re-acknowledgment, they will take effect from the time of the re-acknowledgment, and an acknowledgment of the deed in Court will be taken as a re-delivery and re-execution of the deed, so as to make it a deed as of the date of such acknowledgment.

"It has, therefore, been determined, though a deed has been sealed and delivered before witnesses, yet a subsequent sealing and delivery before new witnesses, is not void, but is effectual to the intent of making that delivery, the date from which the eight months are to be computed, or in other words, the second delivery before new witnesses, is to be taken as a re-execution of that date, so as to make the recording within eight months thereafter, a recording within due time; and this acknowledgment, before new witnesses, is so entirely a new execution, that the deed is to be considered, to every intent and purpose, as a deed of that date, and of course is not to be considered or interpreted as a mere acknowledgment of the first execution and delivery.

"And so a subsequent acknowledgment of a deed, in open Court, will make it a deed as of the date of such acknowledgment:" (2 *Lomax's Digest*, 28.)

A re-hearing is respectfully asked, both on account of the principles involved as well as at least one hundred thousand dollars worth of property, which is lost to the lessors according to the opinion delivered in this case.

R. M. BRADLEY, <em>for plaintiffs in error.</em>

### RESPONSE,
#### By Chief Justice Ewing.

*June 9.*

WE are not so ambitious to emit from this tribunal those corruscations of light, of which the counsel speaks, which are sometimes better calculated to blind, delude and mislead the inferior tribunals, than to enlighten and

A deed made in 1831, made professedly to cure defects in a conveyance made anterior, reciting

FAUNTLEROY'S
HEIRS
*vs*
DUNN.

the former con-
veyance, and a
probability that
it was ineffectu-
al, and that it is
the considera-
tion of the sub-
sequent convey-
ance, will be held
to be operative
as a confirmation
or as a deed of
bargain and sale,
and effect given
to it according to
the intention of
the parties.

direct them, as by the application of plain common sense rules of construction to the transactions of men, to carry out and effectuate their objects and intentions. Nor did we conceive it was necessary to go back to the Norman conquest, or to black letter times, to give construction to the deeds of 1831. To correct the defects in the prior deeds, and perfect the title in fee, in the vendees, was the manifest and avowed object of the deeds of 1831; and that construction should be given to them which will give operation and effect to that object, according to the intention of the parties. Such a construction is best calculated to give security to titles and repose to society, as well as to guard the ignorant against the wily arts of designing men, who are ever on the alert, in ransacking the musty records of ancient titles, and vigilant in spying out apparent defects, not visible or discernible by those not skilled in the black letter art.

If the deeds of 1831 cannot take effect or have operation by way of confirming the title of the wife to the vendees in fee, they may take effect and have operation as her deed of bargain and sale or release. And if they cannot take effect and have operation as a deed of bargain and sale, as to the husband, they may take effect, as to him, as a deed of release or confirmation, or if, as to him, they can have no effect, upon the ground that all his title passed by the former deeds, as it is necessary for the husband to join with the wife to give operation and effect to her deed, his signature and seal to the last deeds may have effect given to them to that end and extent, if to no other. The deeds of the wife, as deeds of bargain and sale or release, have the effect and operation of passing not only her interest for the joint lives of herself and husband, or for the life of her husband, if they have issue : but also, of passing her interest in reversion after his death, as it was the plain and palpable *intention* of the parties to correct the errors of the first deeds, and to pass *all* the interest which the wife held, whether in possession or reversion.

The petition for a re-hearing is overruled.

# Drane *vs* Gregory's Heirs.

EJECTMENT.

APPEAL FROM THE SHELBY CIRCUIT.

*Ejectment. Joint tenants. Partition. Limitation. Adverse possession. Evidence.*

Case 155.

JUDGE MARSHALL delivered the opinion of the Court.

*April 26.*

THIS action of ejectment was brought on the demise of Caroline Gregory's heirs, to recover land which had been conveyed in fee by her deceased husband, by deed made during the coverture, which professed to pass her title, but from a defect in their execution and authentication, were invalid as to her. The land was a part of 1300 acres patented to her father, George Muse, who, in 1790, devised "the residue of his estate," of which it was a part, to his daughters, Kitty and Caroline. In 1797, William Gregory, the husband of Caroline, caused the tract to be divided by three of the Commissioners who had been appointed by the Shelby County Court, under the act of 1792, and shortly afterwards took possession of the equal half which had been allotted to his wife, and by subsequent deeds, made at different periods, under some of which the defendants claimed, seems to have conveyed away the whole of that half. These deeds all show, upon their face, that they were made in right of the wife.

The case stated.

From this statement it is apparent that so far as the defendants, or those under whom they claim, entered upon and held the land in contest under the deeds of Gregory, they could not, according to the doctrines settled by this Court in the cases of Shackleford and Miller, and Shackleford and Smith, reported in 3, 4, 5, and 9 *Dana,* in defence of this action, brought by the heirs of Mrs. Gregory, after the death of her husband, rely upon their possession during his life as adverse, or set up an outstanding adverse title, or one acquired after their entry. It is, therefore, deemed sufficient to say, on this branch of the

One who receives a conveyance from husband and wife of lands, the property of the wife, & enters and holds under that title, (which conveyance is ineffectual to pass the estate of the wife,) cannot after the death of the wife deny the title of the heir of the wife in a suit brought by

DRANE
*vs*
GREGORY's H'RS.

such heir to re-
cover posses-
sion.—
—And it is not
error for the
Court in such
case to refuse, on
defendant's mo-
tion, to exclude
such deeds of
conveyance from
the jury. They
were properly be-
fore the jury to
show the char-
acter of the de-
fendant's entry
and holding.

A deed from the
husband & wife,
conveying all the
lands in the Com-
monwealth of
Kentucky and
Virginia to which
the grantors were
entitled, under
a certain will
*"which they had
not heretofore
sold and convey-
ed,"* does not
embrace, by such
terms, lands
which they had
sold and convey-
ed but by deed,
which was inef-
fectual to pass
the wife's right
of inheritance.

subject, that the Court did not err to the prejudice of the defendants, in giving or withholding instructions.

Nor was there any error in refusing, on motion of the defendants, to exclude the deeds or any of them, so far as they purported to pass the title of Caroline Gregory. The only legitimate object of this instruction was answered by the instruction given on motion of the plaintiffs, that the deeds did not pass Caroline Gregory's title; and they were properly before the jury, because they showed that the land was held and conveyed by Gregory in her right, and they tended to show under what right it was held by the defendants; and even those deeds which did not cover the land in controversy were properly retained, because they tended to show that Gregory had claimed and con-veyed the whole of that part of the patent which had been assigned to his wife in the division.

It is contended, however, that the Court erred in re-fusing to instruct the jury that if Gregory and wife had parted with their title, they should find for the defendants. This instruction was intended to apply to a deed duly ex-ecuted by Gregory and wife, and properly authenticated, but made after the several deeds above referred to, pur-porting to be from the same grantors, by which subsequent deed, after reciting that they had become entitled, in right of said Caroline, to many tracts of land in Kentucky and Virginia, of which they had not acquired possession, &c. they conveyed to Isaac Watkins all the right, title and in-terest "which they, the said William and Caroline now have or hold, in and to all the lands in the Common-wealths of Virginia and Kentucky, and to which they are entitled under the wills (named in the deed) and which they have not heretofore sold and conveyed." But as the Court, in pursuance of the construction which this Court had previously given to the same deed, in reversing and remanding this case, instructed the jury, that if the land in contest was embraced by the previous deeds from Gregory and wife, it was not conveyed by the deed to Watkins; and as it was proved, without contradiction, that the land was embraced by the previous deeds, and there was no evidence to authorize a finding that it was not so embraced, the instruction as asked by the defen-

dants, was not only useless, but misleading, and it was therefore properly refused.

It is further contended, that the verdict is contrary to the evidence, in finding that the defendants, and those under whom they claim, first entered upon and possessed the land in contest, under the deeds of Gregory, in right of his wife, and that the Court, on this ground, should have granted and erred in refusing a new trial to the defendants: but upon scrutinizing the evidence, we are satisfied that the jury were fully authorized to find the fact referred to as they have found it. For, although it may be that both Crabb, the alienor of Gregory, and the defendant, Stephen Drane, the alienee of Crabb, entered within the patent of Muse, before Gregory conveyed to Crabb, it does not appear that such entry was made by either upon the land in contest, or that either of them had any possession of that land until Crabb first acquired it from Gregory, and Drane obtained it afterwards from Crabb, but the contrary is to be inferred. And with regard to the defendant, Stephen T. Drane, the evidence clearly and without contradiction conduces to prove that Mitchell, under whom he claims by deed, and to whom Gregory had many years before conveyed by one of the deeds first above mentioned, entered and held under Gregory's deed.

The finding of the jury was authorized by the evidence.

There was no error, therefore, in refusing to grant the new trial on the ground just noticed. And assuming the fact to be as the jury have found it, that the possession held by the defendants was originally taken and transmitted to them under the deeds from Gregory, and under and not adversely to the title of Mrs. Gregory, it follows upon the principles settled in the cases above referred to, that the lessors of the plaintiff, as heirs of Mrs. Gregory, having commenced this action before any limitation, beginning to run from the death of Gregory, (which was within three years before the commencement of the suit,) could have barred them, have a right to recover the whole of the land thus held by the defendants, unless they are wholly or partially precluded by reason of the facts and considerations now to be noticed.

The suit was commenced before the limitation operated.

DRANE
*vs*
GREGORY's H'RS.

Where there is a severance in fact of a joint tenancy and possession held for 20 years, according to such division, the title will be a title in severalty to the extent of such separate possession.

It appears that by the will of George Muse, this land was devised to his two daughters jointly, so that they held it as joint tenants; and the bill of exception states, that it was proved that the joint tenant, Kitty, had been a *feme sole* for fifty years before the commencement of the suit. Upon these premises, and upon the further assumption that the division of 1797 was inoperative to destroy the joint tenancy, it is argued, that as the joint tenant, Kitty, was barred by the adverse possession of the defendants, and as because joint tenants must sue jointly, if one be barred both are barred, therefore the lessors, claiming in right of one of those joint tenants, are barred; or, that if they be not barred, and can sue separately, they are entitled only to one half of the land, and can recover no more.

Waiving any examination of the doctrine of joint tenancy, contained in this argument, it would be strange indeed if a possession held under Mrs. Gregory's title so long as to bar the right of her co-devisee, should operate to destroy also the title of Mrs. Gregory, under which it was held. So far from this being the case, it cannot be doubted that a bar thus created, (which could not be, unless the possession were held as an exclusive possession, under claim of sole and several title,) would enure solely to the benefit of Mrs. Gregory's title, and would invest her in severalty with the exclusive right of that part of the land which had been thus exclusively possessed. Conceding then, without deciding that the division of 1797 was, as the act of the County Court or its Commissioners, wholly inoperative to sever the joint title, it must still be regarded as a division in fact, made by Gregory, in right of his wife, and assuming in favor of the verdict what the evidence conduces to prove, that he immediately entered in the same right, taking possession of the part assigned to her in exclusion of the co-devisee, and that this exclusive possession was transmitted to, and held by his alienees for considerably more than twenty years—we are clearly of opinion that the co-devisee was bound thereby long before the commencement of this suit, and that the further effect of the possession thus held, and of the consequent bar, was to sever the joint title,

and to clothe Mrs. Gregory, in whose right it was held, with the title in severalty, to the extent of the possession, and freed from all embarrassment on account of any supposed title in the co-devisee.

It seems, however, from evidence introduced by the defendants, that in 1804 the co-devisee had conveyed her interest in this 1300 acres, to Taylor Berry, who, in 1822, conveyed to R. P. Mitchell, who was in possession of a part of the land in contest, under the will of Daniel Mitchell, who had held it for many years under the deed or deeds from Gregory, in right of his wife. Upon these facts we remark, that by the deed of 1804 the joint tenancy, if it then existed, was converted into a tenancy in common, and that the deed of Berry to Mitchell not having been made until after the title, thereby attempted to be conveyed, had been barred, was of no possible avail in this suit, even to limit the extent of the recovery. For whatever might have been the case, had this title been united with the possession held under Gregory's deed before it was barred, as to which it is unnecessary to decide, we think as the case stands, it can furnish no protection whatever to the defendants, who, as decided in the cases already referred to, were bound to restore to the heirs of Mrs. Gregory that possession which they acquired under her title, even though they had acquired while they so held it, some paramount title to the land. Of course they could not avail themselves of any outstanding title.

This conclusion being wholly independent of the validity of the division of 1797, as effecting in itself a severance of the title and possession of the joint devisees, and the Circuit Court having, on motion of the defendants, instructed the jury that it was inoperative to effect such a severance; we need only add on that subject, that the Court having, whether correctly or not we are not called upon to say, given this instruction to the jury, there was no error in refusing to exclude entirely the paper containing the report of the division, because that paper, in connection with other evidence before the jury, tended to show that a division line was in fact run, by the agency of Gregory, and that in right of his wife, he claimed, and held,

DRANE
vs
GREGORY's H'RS.

One who enters as tenant under a particular title, though he may acquire a better title, cannot avail himself of such better title against the title under which he has entered.

A division of land between joint tenants, made thro' the agency of the Commissioners of the County Court, tho' it may have been irregular, may nevertheless be competent to show that a partition was in fact made, and the boundary thereof.

and conveyed a designated portion of the tract to the exclusion of the co-devisee.

Wherefore, there being no error to the prejudice of the defendants, in any opinion of the Court during the trial, or in overruling the motion for a new trial, the judgment is affirmed.

*T. P. Wilson and Graves* for appellants: *McHenry and B. & A. Monroe* for appellees.

*May* 11.

## PETITION FOR RE-HEARING,

### By Mr. T. P. Wilson.

THE appellants in this case respectfully ask the Court to reconsider the opinion herein rendered, and to grant them a re-hearing.

In the opinion asked to be reconsidered it is said, that "this action of ejectment was brought on the demise of Caroline Gregory's heirs, to recover land which had been conveyed in fee, by her deceased husband, by deeds made during the coverture, which professed to pass her title, but from a defect in their execution and authentication, were invalid as to her." And again, that "these deeds all show, upon their face, that the were made in right of the wife." Is not they Court mistaken in these statements? The only deed made before Drane settled upon the land, and before his purchase from Allen, &c. bears date 20th December, 1796, and is made by and between William Gregory *alone,* of the one part, and Jeremiah Crabb of the other; to which is added Caroline Gregory's relinquishment of dower; and there is nothing on the face of the deed showing or tending to show, that it was the intention of William Gregory to convey in right of his wife, or that it was understood by any of the parties to the deed, that he, Gregory, held in right of his wife, or that she had any title whatever to the land. The relinquishment of her dower would indicate the contrary; see record page 8, for copy of deed. There is no defect in the execution of this deed. The grantee, Crabb, did not, could not, from any thing contained in it, discover that Caroline had any title other than a potential dower right to the land. Crabb held and claimed the land as

his own, adversely to the world ; and although a partition was afterwards attempted, it is admitted to have been wholly insufficient to pass title to the respective parties, consequently Crabb was in adversely to Caty Shropshire, *alias* Caty Daws, who was a *feme sole* at the time, and has so continued. She and Caroline being joint tenants, if the statute of limitations constituted a bar to one it was a bar to both. This doctrine is not contradicted. But the Court says, in their opinion, that as the entry was in right of Caroline, the bar cannot operate against her or her heirs. The deed referred to does not show that the entry was in her right. Is not the conclusion, therefore, drawn from the assumption that it was illegitimate?

The Court has, in another part of their opinion, said that there was evidence in the cause to justify the jury in finding "that the defendants and those under whom they claim first entered upon and possessed the land in controversy under the deeds of Gregory, in right of his wife." What testimony is it from which such inference could be drawn? The deed from Allen to Drane is dated 4th day of March, 1811 ; from Eddy and wife to Drane, 23d day of March, 1812 ; from Barbee to Drane, 1st day of July, 1811. This latter deed covers, certainly, twenty-eight acres of the land in controversy.

The deed from Crabb to Drane is dated January, 1820. The only presumption, therefore, arising from these deeds is, that Drane entered claiming adversely to Crabb and to Muse. There is then not one particle of testimony tending to show that Drane entered and took possession of the land in controversy, or any part of it, under the deed from Crabb. The presumption, from the date of the deed, is to the contrary. The price given by Drane to Crabb for the land, as specified in the deed, shows that it was a purchase, by Drane, of a claim conflicting with the one under which he held the possession. A dollar and a half per acre for land in 1820, that would have then brought from twenty to thirty dollars, cannot be supposed to have been given in any other way than as a compromise of a claim, supposed by the parties to be worthless, but to avoid the trouble and expense of a law suit, the party in possession agreed to pay the price specified in

the deed. Corroborative of this, it is proved that Drane, from the time he first settled, has continued to reside within his present boundary, and that he always claimed the land as his own.

It is stated by the Court, that there was no error in refusing to exclude entirely the paper containing the report of the division, because that paper, in connection with other evidence before the jury, tends to show that a division line was, in fact, run by the agency of Gregory, &c.

And is it the law of this land, that because a paper tends, with other evidence, to show a particular fact in a cause, that therefore it is competent evidence, without any proof that it is genuine, that it is what it purports to be? There was no proof of the genuineness or authenticity of the copy of division but that found in the certificate of the Clerk. His certificate, it is believed, to the paper in question, was of no higher dignity than would have been the certificate of any private individual. The paper certified was not a copy of one which the law authorized to be recorded. The order of the County Court appointing the Commissioners, was void, because the requisitions of the statute, from which the Court derives its authority to make the appointment, were not complied with by the Court. The law requires the appointment of six; the Court appointed but five; the requisite number to authorize a part to act was wanting. The act of a part, therefore, was nugatory, and the certificate of the Clerk that such acts had been done and performed by them, to a paper specifying those acts, was without effect. The certificate of a Clerk, to a copy from the record in his office, is only authentic when the original is, by law, authorized to be recorded.

The County Court order, appointing the Commissioners, stands so awkwardly on the record in this cause that it is feared the Court may have overlooked it. It is on the 43d and 44th pages, after the order granting the appeal. It is insisted that the County Court had jurisdiction to appoint six Commissioners, but not to appoint five: (See *Stat. Law*, 1066.) In the case of *Nesbit vs Gregory*, (7 *J. J. Marshall*,) the Court say, where the power of the County Court is derived from a statue, "its

T. P. WILSON, *Attorney for appellants.*